## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TINA DOBYNE, Special Administrator of the estate of TIMOTHY DOBINE, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 20-cv-3594 |
| v. | ) ) | Hon. Steven C. Seeger |
| UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

### MEMORANDUM OPINION AND ORDER

An ambulance took Timothy Dobine to the hospital after he threw up and complained that his stomach burned.  The next morning, doctors thought that his symptoms sounded like appendicitis, so he went into surgery.  After taking a look, the surgeon discovered that his appendix looked normal, but he removed it anyway (as is routine).

Not long after surgery, a nurse found Dobine in the bathroom.  He was unresponsive.  A rapid response team provided emergency help.  They took him to the intensive care unit, where the medical staff administered CPR.  A few days later, after a second surgery, Dobine died.

The estate later filed two lawsuits – one in state court, and the other in federal court – against the medical team.  The state court case includes claims against the larger group of doctors, including the surgeon and the residents.

The case at hand is about the care provided by the attending physician, Dr. Morgan Madison.  The estate brought claims against the United States under the Federal Tort Claims Act, alleging that Dr. Madison provided negligent care.  The United States is the defendant because Dr. Madison worked for a federally qualified healthcare center.

Dr. Madison did not decide that Dobine needed surgery, and she did not perform the surgeries, either.  Dr. Madison was not at the hospital when Dobine arrived.  And she was not in the building when Dobine was treated by the rapid response team.  In fact, Dr. Madison did not see Dobine for the first time until he was intubated in the ICU.

After discovery, the United States moved for summary judgment.  For the reasons that follow, the motion for summary judgment is granted.

## Background

In July 2017, Timothy Dobine vomited a few times and complained that his stomach burned.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 5 (Dckt. No. 44).  Sometime that night, an ambulance brought him to West Suburban Medical Center in Oak Park, Illinois.  *Id.* at ¶¶ 5, 14.  The record does not reveal what time he arrived, but the key point is that Dr. Morgan Madison was not there.

The hospital admitted Dobine under the care of Dr. Madison.  *Id.* at ¶ 8.  She worked for PCC Community Wellness Center, a federally qualified healthcare center.  *Id.*  So Dr. Madison is deemed to be a federal employee.  *Id.*; *see also* 42 U.S.C. § 233(g).

Dr. Madison had hospital privileges at West Suburban Medical Center.  *Id.* at ¶ 9.  In 2017, Dr. Madison was the "attending on service" physician for the family medicine service at West Suburban four times per year, for one week at a time.  *Id.*  During those weeks, Dr. Madison cared for patients and supervised residents.  *Id.*

An attending physician in the family medicine service at West Suburban was a family physician with admitting privileges to the hospital.  *Id.* at ¶ 10.  But attending physicians do not provide in-house, 24-7 care for patients.  *Id.*  Residents cared for patients (like Dobine) under Dr. Madison's supervision.  *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 2–3, 5

2

(Dckt. No 47). A rapid response team is responsible for acute emergencies, too. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 44).

Sometimes Dr. Madison accepts the admission of a patient when she is not in the hospital. *Id.* at ¶ 12. When Dr. Madison accepts a patient, her typical practice is to notify the residents about the admission. *Id.* If Dr. Madison is not in the hospital when a patient is admitted, the residents visit and evaluate the patient first. *Id.*

When a patient arrives overnight, it is the customary practice for a resident to see the patient, and then give an update to the attending physician. *Id.* at ¶ 14. The residents go over the medical history, physical exam findings, labs and imaging, and assessment and plan with Dr. Madison. *Id.* at ¶ 13. At that point, Dr. Madison provides feedback. *Id.* Dr. Madison typically sees the patient later that day or the following day, depending on when the patient was admitted. *Id.*

The resident and Dr. Madison followed that protocol when Dobine arrived at the hospital. *Id.* at ¶ 14. Dr. Madison was not at the hospital when Dobine was admitted, so a resident saw him first. After that exam, the resident informed Dr. Madison about the evaluation, explained Dobine's history and physical exam, and presented her assessment and plan. *Id.*

Dr. Madison offered feedback. *Id.* The two clarified and solidified the plan. *Id.* The general plan was to admit Dobine, do serial exams, monitor him, and make sure that "surgery is on consult." *Id.* at ¶ 15.

At West Suburban, residents generally enter orders for a patient. *Id.* at ¶ 16. But they do so guided by the assessment and plan discussed with and approved by the attending physician. *Id.* The attending physician does not need to review and approve the orders that residents issue. *Id.*

Dr. Madison instructs residents to contact her if they have any questions, or if there is an acute change in a patient's status. *Id.* at ¶ 31.

The next morning, a resident physician gave Dobine a blood thinner (Heparin). *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 9 (Dckt. No 47). There is no evidence in the record that Dr. Madison directed the resident to give a blood thinner to Dobine, or that the resident requested or received Dr. Madison's approval for that medicine.

At some point that morning (July 20), Dr. Madison went to the hospital for her morning rounds. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 17–18 (Dckt. No. 44). But she did not see Dobine during her rounds. *Id.* at ¶ 18.

By that point, the general surgery team had already taken Dobine to the operating room. *Id.* Dr. Madison did not make the decision that Dobine needed surgery. *Id.* at ¶ 19. Instead, a general surgeon decided to take Dobine to the operating room.[1] *Id.*

Dr. Scott Reishus performed the surgery. Dr. Reishus started an appendectomy because he thought that Dobine had the signs, symptoms, and radiology findings that were consistent with appendicitis. *Id.* at ¶ 20.

During the surgery, Dr. Reishus realized that Dobine did not have appendicitis. *Id.* at ¶ 21. But Dr. Reishus removed Dobine's appendix anyway. *Id.* Apparently, it is "routine to do so, to prevent issues in the future." *Id.*

When the surgery was over, Dr. Reishus thought that Dobine had good vital signs in the recovery room. *Id.* at ¶ 28. After some time, at about 12:10 p.m., hospital staffed moved Dobine from the recovery room to the floor. *Id.* at ¶ 29.

---

[1] At the hospital, the general surgeon would decide when to take a patient to the operating room. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 44).

Dr. Madison did not see Dobine on the floor after the surgery. *Id.* at ¶ 30. By that point, she had left the hospital to go to the PCC Community Wellness Clinic. *Id.*

But before she left the hospital for the day, Dr. Madison did discuss Dobine's care with the residents. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No 47). That discussion took place during her morning rounds, before Dobine returned from surgery. *Id.*

So, another doctor (Dr. Tiffany Chang) evaluated Dobine on the floor after his surgery. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 44). Dobine told her that he had abdominal pain. *Id.* at ¶ 35. Dr. Chang said that the pain did not strike her as "ominous." *Id.*

Dobine had normal vital signs, including a normal temperature, heart rate, respiratory rate, blood pressure, and oxygen saturation. *Id.* at ¶ 36. Dobine also had normal values for glucose, white blood cells, hemoglobin, and platelets. *Id.*

Dr. Chang did not believe that Dobine was suffering from any problems that required a consultation with a more senior doctor. *Id.* at ¶ 44. So, Dr. Chang did not call Dr. Madison. *Id.*

For some reason, things apparently took a sharp turn for the worse in a short period of time. At about 12:30 p.m., a nurse helped Dobine to the bathroom. *Id.* at ¶ 46. When the nurse returned not much later, Dobine was unresponsive. *Id.* He was foaming from his nose and mouth. *Id.*

So, at 12:45 p.m., a rapid response call went out over the hospital's speaker system. *Id.* at ¶¶ 47–48. Dr. Tiffany Forte responded alongside other staff. *Id.* When she arrived, Dobine was on the toilet with "labile consciousness," meaning that "at times it appeared that he was sleeping and not responding to verbal stimuli." *Id.* at ¶ 49. He was "in and out of consciousness." *Id.*

5

The rapid response team moved Dobine to his bed, checked his vitals, and gave him IV fluids. *Id.* at ¶ 50. The team placed Dobine in restraints because his body was agitated. *Id.* at ¶ 51. Dr. Forte's "differential diagnosis during the rapid response included seizure, myocardial infarction, pulmonary embolism, esophageal perforation or rupture, or surgical complications," including internal bleeding. *Id.* at ¶ 52.

Again, at that point, Dr. Madison was not in the building. *Id.* at ¶ 30. Dr. Forte did not call Dr. Madison, either. *Id.* at ¶ 53.

Dr. Forte ordered Dobine's transfer to the ICU because he was in critical condition. *Id.* at ¶ 56.

Dobine arrived at the ICU at 3:05 p.m. *Id.* He did not have a pulse. *Id.* ICU staff called a "code blue." *Id.* They performed CPR to resuscitate him. *Id.*

At that time, Dr. Madison was not told about the sudden turn of events. Dr. Madison did not receive any communication from the residents after Dobine returned to the floor and before his cardiac arrest. *Id.* at ¶ 57.

There is no evidence in the record that Dr. Madison was directing Dobine's care during that emergency from afar, while she was out of the hospital. That is, there is no evidence that Dr. Madison told the residents how to deal with Dobine's unresponsiveness, or directed the residents to take him to the ICU. In fact, there is no evidence that the rapid response team stopped what they were doing and contacted Dr. Madison. There is no evidence in the record that Dr. Madison knew about the emergency, or that anyone told her about Dobine's sudden downturn, until after the fact. *Id.* at ¶ 57.

Later that evening, Dr. Madison saw Dobine in person for the first time. *Id.* at ¶ 58. Dobine was in the ICU. *Id.* He was intubated. *Id.* According to Dr. Madison, he was "acutely ill." *Id.* at ¶ 59.

When a patient is admitted to the ICU, the critical care attending physician is the main manager of the patient. *Id.* at ¶ 78.

Two days later (on July 22), Dr. Reishus operated on Dobine for a second time. *Id.* at ¶ 63; *see also* Reishus Dep., at 96:17-20 (Dckt. No. 38, at 110 of 194). According to Dr. Reishus, he found clotted blood in Dobine's abdominal cavity. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 63 (Dckt. No. 44). Dr. Reishus says that he did not find an "active" bleeding source. *Id.*

Dobine died the next day (July 23). *Id.* at ¶ 66. His death certificate reflected a long list of causes of death: "seizures, acute CVA, cerebrovascular accident, intraabdominal bleed," and "nontraumatic hemorrhagic shock and cardiopulmonary arrest." *Id.* (cleaned up).

Dobine's estate believes that Dobine died from an "untreated postoperative bleed which led to cardiac arrest [*i.e.*, a heart attack]." *Id.*

Dobine's estate filed two lawsuits – one in state court, and the other in federal court. The state court lawsuit includes claims against most of the doctors, including Dr. Reishus, Dr. Chang, and Dr. Forte (among others). *Id.* at ¶ 79.

The estate also filed the case at hand against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq. See* Cplt., at ¶ 1 (Dckt. No. 1).[2] The complaint alleges that

---

[2] An astute reader may have noticed a slight difference in the spelling of the last names. The patient was Timothy Dobine. The special administrator of the estate is Tina Dobyne (not Dobine). The spelling is similar, but not identical.

Dr. Madison provided negligent medical care and proximately caused Dobine's death. *Id.* at ¶¶ 17–19.

The estate offered an expert, Dr. Nelson, who opined that the medical staff had deviated from the standard of care. For example, Dr. Nelson opined that the residents had deviated from the standard of care by giving Dobine the blood thinner (again, Heparin) on the day of the first surgery. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 67 (Dckt. No. 44). Dr. Nelson also opined that the residents had deviated from the standard of care by giving morphine to Dobine after his surgery (apparently when he was unresponsive). *Id.* at ¶ 71.

Dr. Nelson also opined that the residents should have called Dr. Madison during the rapid response. *Id.* at ¶ 72. He also expressed the opinion that Dr. Madison should have ordered an abdominal CT scan on July 20, after Dobine's heart attack. *Id.* at ¶ 75.

After discovery, the United States moved for summary judgment. *See* Def.'s Mtn. for Summary Judgment (Dckt. No. 36). The Court turns to the motion.

## Legal Standard

A party is entitled to summary judgment if it shows that there is "no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." *See Jaranowski v. Ind. Harbor Belt R.R. Co.*, 72 F.4th 744, 749 (7th Cir. 2023) (citation omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the burden to show that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive, the opposing party must identify specific facts showing a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

To decide the motion, this Court views the evidence and draws all reasonable inferences in the estate's favor as the non-moving party. *See Jaranowski*, 72 F.4th at 749. This Court does not weigh the evidence, or judge witness credibility, or determine the truth of the matter. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Instead, the Court determines whether a genuine issue of triable fact exists. *Id.*

In sum, summary judgment is appropriate if no reasonable jury could return a verdict in favor of the non-moving party, based on the record at hand. *See Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Sovereign immunity shields the federal government from lawsuits. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994). But Congress lowered the shield when it passed the Federal Tort Claims Act. The FTCA "waived the sovereign immunity of the United States for certain torts committed by federal employees." *See Brownback v. King*, 141 S. Ct. 740, 746 (2021) (citation omitted).

Congress authorized suits against the United States in limited circumstances, for a "death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See* 28 U.S.C. § 1346(b).

Courts analyze FTCA claims based on the "substantive law of the state where the alleged tort occurred." *See Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003). Here, the alleged tort happened in Illinois. *See* Cplt., at ¶¶ 12–13 (Dckt. No. 1). So Illinois law governs and provides the substantive rules, including the standard of care.

9

The estate brings a negligence claim based on the care provided by Dr. Madison. As the estate sees it, Dr. Madison provided substandard care and proximately caused Dobine's death. The estate seeks to hold the United States accountable because Dr. Madison is deemed to be a federal employee.[3] *See* Cplt., at ¶ 19 (Dckt. No. 1); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 66 (Dckt. No. 44).

Under Illinois law, an attending physician cannot be held vicariously liable for the negligence of a resident under her supervision. *See Lewis v. OSF Healthcare Sys.*, 2022 WL 5240557, at *5 (Ill. App. Ct. 2022) ("Plaintiff . . . has presented no case standing for the proposition that an attending physician is vicariously liable for the negligence of a resident under his supervision."). A doctor is responsible for his or her own negligence, not the negligence of other doctors.

So, to bring a negligence claim about Dr. Madison, the estate must offer evidence that is sufficient to support a finding by a reasonable jury that Dr. Madison herself was negligent. Negligence by other doctors is not enough, even though Dr. Madison was the attending physician.

On this record, any claim against Dr. Madison faces an uphill battle. The record reveals that Dr. Madison had relatively little involvement with Dobine, despite her status as the treating physician.

From beginning to end, Dr. Madison played a limited role. Dr. Madison did not see Dobine when he arrived at the hospital. She was not involved in his surgeries. She was not in

---

[3] Remember, Dr. Madison was an employee of a federally qualified healthcare center. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 44). So, Dr. Madison is deemed to be an employee of the United States under 42 U.S.C. § 233(g). *Id.*; *see also id.* at ¶ 4 ("The United States . . . is the proper defendant in a Federal Tort Claims Act lawsuit alleging negligence by a deemed federal employee.").

the hospital during the emergency treatment by the rapid response team. And she did not direct his medical care in the ICU, either.

Even so, the estate puts forward three theories why, in its view, Dr. Madison provided negligent care. The first theory is about a failure to supervise. The second theory is about a failure to evaluate Dobine in person. The third theory is about a failure to contact the surgeon during the postoperative period before Dobine's heart attack. *See* Pl.'s Resp., at 2 (Dckt. No. 43).

The Court will address the evidence supporting each theory. On this record, no reasonable jury could return a verdict in the estate's favor.

## I.    The Failure to Supervise.

The estate begins with the argument that Dr. Madison negligently failed to properly instruct and supervise the residents. *Id.* In the end, that theory is just a theory, lacking support in the record.

The failure-to-supervise theory is largely about blood thinners. Recall that a resident gave Dobine a blood thinner (Heparin) the morning after his arrival, at some point before surgery. The estate contends that the blood thinner increased the risk of bleeding-related complications. *Id.* at 3.

The estate attempts to place the decision to give the blood thinner at Dr. Madison's feet. As the estate sees it, "Dr. Madison agreed with the decision to administer Heparin," and thus shares the blame for the fatality. *Id.*; *see also* Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 45).

Notice the phrasing. The estate doesn't argue that Dr. Madison prescribed a blood thinner. And the estate doesn't contend that Dr. Madison directed the resident to give Dobine a blood thinner, or signed off on the plan to give him a blood thinner, or anything along those

11

lines. Instead, the estate believes that Dr. Madison is liable because she "agreed" with that decision.

It takes only modest probing for the argument to fall apart. The estate does not offer any evidence that Dr. Madison made, approved, or ratified the decision to give Dobine a blood thinner at that time. An expression of agreement by Dr. Madison *at her deposition* – long after the events took place – doesn't count. *See* Madison Dep., at 82:17 – 83:24 (Dckt. No. 38, at 42 of 194). What matters is what Dr. Madison did, and did not do, at the time, not years later.

The estate cites a few passages of testimony from its expert, Dr. Nelson, and nothing else. *Id.* (citing Nelson Dep., at 26:4-5, 28:9-18 (Dckt. No. 38, at 184 of 194)). Right off the bat, that citation is a bit of a red flag. Dr. Nelson is an expert, not a fact witness. He doesn't have personal knowledge of the facts. At best, he could summarize and then opine about other evidence in the record.

Putting that reality aside, Dr. Nelson did not testify that Dr. Madison made the decision to give a blood thinner to Dobine. The proffered testimony says no such thing. The first answer begins: "Well, it's not clear how that occurred," meaning how the decision was made to give a blood thinner to Dobine. *See* Nelson Dep., at 25:10 (Dckt. No. 38, at 183 of 194). The second passage of testimony did not say that Dr. Madison made the decision, either. *Id.* at 28:9-18.

The lack of other citations is glaring, too. Noticeably missing is any citation to the deposition of Dr. Madison, or the testimony by the resident. The estate does not offer any testimony from Dr. Madison or from the resident about whether they discussed giving Dobine a blood thinner.

Maybe there is testimony out there somewhere supporting the notion that Dr. Madison made or approved the decision to give a blood thinner to Dobine. But if so, the estate didn't cite

12

it, so it doesn't count. *See* L.R. 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact.").

A plaintiff cannot get to trial with a theory of liability, unadorned by supporting facts. The possibility that evidence might be out there isn't a ticket to trial, either. Quite the opposite – it is a ticket to the exits of the courthouse.

Summary judgment is the time for the non-moving party to put its evidentiary cards on the table. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). "A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996).

Next, the estate blames Dr. Madison for failing to discuss Dobine's risk of postoperative bleeding with the residents. "The standard of care required that Dr. Madison discuss Mr. Dobine's increased risk of postoperative bleeding complications with her residents during this morning report, but she failed to do so." *See* Pl.'s Resp., at 3 (Dckt. No. 43).

The estate fails to offer evidence that Dr. Madison failed to discuss risks with the residents. Once again, the estate relies exclusively on the testimony of Dr. Nelson. *See* Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 45). And once again, the estate sketches a theory, but does not fill it in with facts.

In the cited passage from his deposition, Dr. Nelson did not testify that Dr. Madison failed to discuss postoperative risks with the residents. Instead, Dr. Nelson testified that Dr.

13

Madison *should have* discussed those risks with the residents. *See* Nelson Dep., at 28:18 – 29:2

(Dckt. No. 38, at 184 of 194) ("And that conversation should have been had at morning report

with the residents who are going to see that patient after the surgery.  I don't know if at morning

report they knew.").

At best, that passage addresses the standard of care.  It cannot support a statement of fact

about what actually happened, meaning whether Dr. Madison discussed certain risks with the

residents.  There is a wide and yawning gap between stating what happened and stating what

*should have* happened.

The estate's theory of liability is a two-part equation.  The estate believes that Dr.

Madison needed to discuss X with the residents, but failed to discuss X with the residents.  The

"should have" part of the equation is only half of the equation.

The crux of the argument is the premise that Dr. Madison failed to discuss the risks.  To

get to trial, the estate needed to offer evidence that Dr. Madison failed to discuss the risks with

the residents.  That is, negligence requires a comparison of what happened, and what should have

happened.  Evidence about the standard of care is not the same thing as evidence about a breach

of the standard of care.

The estate comes up empty.  The estate comes forward with no evidence about whether

Dr. Madison discussed those postoperative risks with the residents.  As the government points

out, there is no evidence on that topic, one way or the other.  *See* Def.'s Reply, at 2 (Dckt. No.

46).

Maybe Dr. Madison and the residents discussed the risks, or maybe they didn't.  Whether

they discussed that topic is anyone's guess – but a party cannot avoid summary judgment by

14

guesswork. *See Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006) ("[W]hen the evidence provides for only . . . guessing, summary judgment is appropriate.").

The final leg of the failure-to-supervise stool is about the lines of communication. The estate argues that Dr. Madison was negligent when she failed to "instruct her residents to call her when her patient has a rapid response or a change in condition." *See* Pl.'s Resp., at 4 (Dckt. No. 43) (citing Pl.'s Statement of Facts, at ¶ 27 (Dckt. No. 45)).

That theory is not consistent with the evidentiary record. Based on the undisputed facts, Dr. Madison does instruct the residents to contact her if there is an acute change in a patient's status. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 31 (Dckt. No. 44).[4] And in any event, the estate does not support the notion that contacting Dr. Madison would have made a difference to the rapid response team when they gave emergency help to Dobine.

In the end, the estate's failure-to-supervise theory is a theory without supporting facts. To get to trial, the estate needed to offer more than evidence about the standard of care. The estate needed to offer concrete evidence that Dr. Madison failed to satisfy that standard of care by failing to supervise the residents. And on this record, the evidence simply isn't there.

## II.     The Failure to Evaluate Dobine in Person.

The second theory is about the lack of an in-person evaluation. The estate argues that Dr. Madison was negligent when she failed to "come to the hospital and examine her patient." *See* Pl.'s Resp., at 6 (Dckt. No. 43); *see also* Pl.'s Statement of Facts, at ¶ 25 (Dckt. No. 45) ("Dr. Madison fell below the standard of care because she was not at the hospital with Mr. Dobine

---

[4] True, the estate disputed part of this paragraph, meaning paragraph 31 of the government's statement of facts. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 31 (Dckt. No. 44). But the estate did not dispute the portion of the paragraph about the instructions that Dr. Madison gave to her residents. Instead, the estate responded by addressing the standard of care – that is, what an attending physician "can" and "must" do during an emergency. *Id.*

15

while he was being seen by the residents under her supervision."). To support its argument, the estate cites Dr. Nelson's deposition yet again. *See* Pl.'s Statement of Facts, at ¶ 25.

Once again, from an evidentiary perspective, the estate is over its skis. Dr. Nelson did not testify that Dr. Madison had an absolute duty to treat Dobine in person. Instead, he testified that Dr. Madison "*either* need[ed] to be there at the hospital with [the] patient . . . *or* she need[ed] to . . . properly instruct [the residents] to communicate with her immediately if there are changes in the patient's condition." *See* Nelson Dep., at 59:23 – 60:5 (Dckt. No. 38, at 192 of 194) (emphasis added).

Put differently, Dr. Nelson testified that Dr. Madison could meet the standard of care in two ways. One way was to treat Dobine in person. The other way was to allow the residents to perform in-person care, with an instruction to contact her if his condition worsened. Based on this record, a reasonable jury could not find that Dr. Madison breached that standard of care.

Plus, the theory does not sit well with the chronology. Dr. Madison was not at the hospital when Dobine was admitted. When Dr. Madison returned to the hospital, he was already in surgery. And when she saw him for the first time, Dobine was in the intensive care unit.

That record does not leave a window of opportunity for a finding of negligence. The simple reality is that Dr. Madison was not in the building during the critical events. There is no evidence, for example, that Dr. Madison was in the hospital during key moments, but simply blew him off.

The estate fails to come forward with any case law supporting the proposition that an attending physician must be at the hospital at all times for their patients. And for good reason –

16

that standard is not achievable, given the limitations of space and time.[5]  Illinois law does not

require doctors to reside at the hospital and care for patients 24/7, 365 days of the year.

### III.  The Failure to Contact the Surgeon.

The estate devotes only two sentences to its third and final theory of liability.  The theory

appears to be that Dr. Madison should have communicated with the surgeon after the first

surgery, and before Dobine had a heart attack later that afternoon.  The idea is that Dr. Madison

should have flagged a potential problem.

"Had Dr. Madison complied with the standard of care and either had been at the hospital

herself or had properly instructed the residents to contact her in the event of postoperative

changes with Mr. Dobine, either Dr. Madison or the residents under her supervision could have

advised the surgeon that Mr. Dobine was experiencing conditions that indicated a postoperative

bleed.  The failure to get Mr. Dobine into surgery during those hours in the postoperative period

lost any chance to save him from his postoperative bleed and then ultimate cardiac arrest."  *See*

Pl.'s Resp., at 6 (Dckt. No. 43).

That theory fails, too.  The third theory seems to rely on the success of the failure-to-

supervise theory (theory #1) or the failure-to-be-at-the-hospital theory (theory #2).  It's a

bootstrap argument without a leg to stand on.

The evidence is lacking.  The estate relies on paragraph 28 of its statement of facts, and

relies on a few pages from the depositions of Dr. Nelson and Dr. Luchette (another expert

witness).  *See* Pl.'s Resp., at 6 (Dckt. No. 43); *see also* Pl.'s Statement of Facts, at ¶ 28 (Dckt.

---

[5]  In the heading of this section in the Estate's brief, the Estate says that Dr. Madison was negligent when she "failed to order a CT scan."  *See* Pl.'s Resp., at 5 (Dckt. No. 43).  But the Estate doesn't utter the phrase "CT scan" throughout the rest of its brief.  *See id.* at 5–7.  So, if the Estate has a negligence theory based on a missing CT scan, it is waived – because a developed CT scan argument is missing from the brief.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived.").

No. 45); Nelson Dep., at 60:15 – 61:7 (Dckt. No. 38, at 192 of 194); Luchette Dep., at 37:6-13 (Dckt. No. 45, at 19 of 89).

Once again, those passages discuss the standard of care. They do not support the notion that Dr. Madison knew about warning signs – such as low blood pressure – and failed to communicate that information to the medical team. There is no evidence that the residents alerted Dr. Madison to the emergency intervention by the rapid response team. That is, there is no evidence that Dr. Madison knew that Dobine had symptoms consistent with internal bleeding. Evidence about Dr. Madison's knowledge of a potential problem is lacking.

Again, if the theory is that Dr. Madison should have known about the problems, then that theory cannot survive on this record. The argument depends on the notion that Dr. Madison should have been in the hospital during key events, or should have instructed the residents to tell her if things deteriorated.

But Dr. Madison did not have a duty to be in the hospital at all times. There is no evidence suggesting that she shirked an opportunity to see Dobine (*e.g.*, by going out for coffee and disregarding an emergency call). And based on the undisputed facts, Dr. Madison did instruct the residents to contact her if the patient's condition worsened.

Overall, the argument is a theory without a lot of factual development. There are too many loose ends, open holes, and unanswered questions. The record does not support the notion that Dr. Madison had information about a problem at an important time, and sat on it. And the record does not support the theory that Dr. Madison should have done something differently, either.

* * *

The Court concludes that the estate has not come forward with sufficient evidence to support a finding by a reasonable jury that Dr. Madison provided negligent care. Even so, that conclusion does not change the fact that a terrible tragedy took place at the hospital that day. The Court is mindful of the very human aspect of the case, including the loss suffered by the family, and expresses its sympathies.

### Conclusion

Based on the record, no reasonable jury could return a verdict in the estate's favor. The government's motion for summary judgment is hereby granted.

Date: January 11, 2024

Steven C. Seeger
United States District Judge

19